**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **EARLEY INFORMATION SCIENCE,** ) | |
| **INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **19-10364-FDS** |
| ) | |
| **OMEGA ENGINEERING, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This is a lawsuit arising out of a contract for data-organization services.  In 2017, Omega

Engineering, Inc., retained Earley Information Science, Inc., to organize and migrate product

data to modernize Omega's e-commerce platform.  For reasons disputed by the parties, that

effort was largely unsuccessful.  Earley has sued Omega for breach of contract and several

related claims.  Omega has asserted counterclaims arising out of the same contract.  Jurisdiction

is based on diversity of citizenship.

Omega has moved for summary judgment as to Earley's claims for unfair trade practices

under Massachusetts and Connecticut law.

For the following reasons, that motion will be granted.

**I.** **Background**

**A.** **Factual Background**

The following facts are as set forth in the record and are undisputed except as noted.

Omega Engineering, Inc., is a Connecticut-based corporation that produces, distributes, and sells engineering products.  (Def. SMF ¶¶ 1, 3-4; Vorih Dec. ¶ 3).[1]  In 2016, Omega asked Earley Information Science, Inc., to assess its external website to determine its suitability as an e-commerce platform.  (Def. SMF ¶ 6).  Earley made recommendations to modernize and improve Omega's e-commerce capabilities.  (*Id.* ¶ 7).  Those recommendations included implementing Product Information Management ("PIM") to collect and manage data related to Omega's products.  (*Id.* ¶ 8).

Omega then retained Earley to perform the PIM-implementation work.  (*Id.* ¶ 10).  That work was divided into two phases, each of which was memorialized in a separate Statement of Work.  (*Id.*).  Phase 1, which spanned approximately three months, was completed in April 2017.  (*Id.*).  Phase 2 was significantly broader in scope, duration, and cost.  (*Id.*; *see also* Huber Dec. Ex. 1 ("Phase 2 Statement of Work")).  It was scheduled to last approximately one year and to cost more than $2 million.  (Def. SMF ¶ 10).

In late 2017 or early 2018, Omega began to have concerns about the progress of the work.  (Def. SMF ¶ 19; Brolet Dep. 28-29; Wiener 30(b)(6) Dep. at 157).[2]  Kathleen Wiener, Director of Global Master Data Management for Omega (and Omega's 30(b)(6) deponent), testified that she first "came to the conclusion that Earley had not done some or all of what it was supposed to do under the [Statement of Work]" during the "end of February [or] early March."  (Wiener 30(b)(6) Dep. at 157).  On March 13, 2018, employees from Omega and Earley met to

---

[1] Earley disputes that "the production, distribution, and sale of engineering products and equipment" represents Omega's "primary line of business" as that term is used in case law related to the Connecticut Unfair Trade Practices Act.  (Pl. Resp. to Def. SMF ¶¶ 3-4).

[2] Earley disputes this statement to the extent that it implies that the parties agree about the scope of work required by the Phase 2 Statement of Work.  (Pl. Resp. to Def. SMF ¶ 19).  Early also contends that the problems and delays executing the Phase 2 work were "attributable to Omega and/or vendors chosen by Omega."  (Pl. Opp. at 3).  It does not appear to dispute, however, that Omega was concerned about the work by this time.

discuss the progress of the work.  (Def. SMF ¶ 21; Schweizer Dep. at 152-55; Schweizer Dep. Ex. 10, at 1).  At that meeting, according to Chantal Schweizer, a consultant at Omega, Wiener "was very concerned with gap fill and wanted to know why it [had not] been brought to her attention that gap fill [was not] as near 100% as she was expecting it to be."  (Schweizer Dep. Ex. 10, at 1).  Wiener also indicated that she believed that there might be a "need to start from scratch."  (*Id.*).

About one week later, on March 21, employees from Omega and Earley held another meeting.  (Anthony Dec. ¶ 7).  At that meeting, according to Earley's Vice President of Delivery Michael Anthony, "Omega's representatives expressed dissatisfaction with the status of the Project but also admitted that Omega was at fault for certain problems and delays."  (*Id.*).

The next day, the parties reconvened.  (Def. SMF ¶ 25).  Earley had prepared a PowerPoint presentation titled "EIS PIM Implementation Phase 2 Close-Out Discussion."  (Ali Dep. Ex. 32 ("Close-Out Meeting Presentation") at 1).  The parties discussed the work completed thus far by Earley.  (Anthony Dec. ¶ 10; Close-Out Meeting Presentation at 2).  They further discussed Omega's concerns and the work remaining for Phase 2.  (Anthony Dec. ¶ 10; Close-Out Meeting Presentation at 3).  According to Anthony, they "agreed upon a 'punch list' of the remaining deliverables that [Earley] would provide to Omega to complete the work that [Earley] would be doing on the Project."  (Anthony Dec. ¶ 10).  Anthony further states that Earley "made it 100% clear" to Omega that, upon completion of that work, it would be delivering "33% of the individual product level data," rather than 100% of that data.  (*Id.*; *see also* Close-Out Meeting Presentation at 6).[3]

---

[3] Omega contends that Earley admitted that it "could not complete 100% of the work" required under the Phase 2 Statement of Work.  (Def. SMF ¶¶ 28-29).  Early disputes that failure to complete 100% of the data-

According to Anthony, "Omega's representatives clearly stated that after [Earley] completed the agreed-upon punch list tasks, Omega would pay [Earley] the remaining amount owed to it under the PIM Phase 2 [Statement of Work]."  (Anthony Dec. ¶ 12).  By this time, Omega had paid Earley about $1.85 million on the Phase 2 Statement of Work, which had a cap of approximately $2 million.  (Huber Dec. Ex. 6; Ali Dep. 175-77; Phase 2 Statement of Work at 19).  Earley subsequently "dedicated significant time and resources to completing those tasks," which it contends it finished in April 2018.  (Anthony Dec. ¶¶ 12, 18).

Approximately two weeks after the close-out meeting, on April 4, 2018, Omega issued a purchase order for $150,000.  (Anthony Dec. Ex. F ("April 4, 2018 Purchase Order")).  The parties dispute the reason for that order.  Omega contends that it was generated "[a]s part of the schedule of purchase orders contemplated in the PIM Phase 2 [Statement of Work]."  (Def. SMF ¶ 31).  It notes that $150,000 was "the approximate amount remaining" under that Statement of Work.  (*Id.*).  Michael Ali, Omega's Chief Information Officer, testified that he believed that the purchase order "would have . . . been generated as part of [the] schedule" under the Phase 2 Statement of Work.  (Ali Dep. at 178; *see also id.* at 179).  He had sent an e-mail shortly before the close-out meeting stating that Omega "owe[d] roughly $150K against the original $2.003M contract" and that Omega "would expect to pay that $150K once [it] receive[d] the final deliverables (still to be agreed [to] . . .)."  (Huber Dec. Ex. 6).  Likewise, Wiener testified that the $150,000 purchase order was "part of the overarching [Statement of Work]" and "all that was left of the balance of the PO for the entire contract."  (Wiener 30(b)(6) Dep. at 145; *see also id.* at 146 ("It was just simply the balance that Earley felt they were owed against the original two

---

migration work is the same as failure to fulfill its obligations under the Phase 2 Statement of Work.  (Pl. Resp. to Def. SMF ¶¶ 28-29).

million I believe contract.")).

Earley disputes that the purchase order was issued to cover the balance remaining under the Phase 2 Statement of Work. (Pl. Resp. to Def. SMF ¶¶ 31-32, 34). It contends that the order "equaled neither the remaining amount owed to [Earley] (approximately $180,000) nor the amount of the [Statement of Work] less purchase orders issued to date ($145,689.80)." (*Id.* ¶ 32). It further contends that the order "was issued and delivered to [Earley], when [Earley] was in the middle of completing the punch list tasks, as a further inducement to continue working on the punch list tasks, in the belief that it was going to get paid upon completion." (*Id.* ¶ 34; *see also* Anthony Dec. ¶ 17 ("The issuance of this purchase order was consistent with and further evidence of what Omega had told us at the Close-Out Meeting, namely, that upon completion of the punch list tasks, [Earley] would be paid the remaining amount owed under the PIM Phase 2 [Statement of Work].")).

Omega decided to not pay that purchase order. (Wiener 30(b)(6) Dep. at 144-45).[4] That decision was made by Wiener, Ali, and Joe Vorih, who was Omega's Chief Executive Officer at that time. (*Id.*). According to Wiener, they made that decision "because of the amount of work that was required for [Omega] to do to just even foundationally get the work done." (*Id.* at 145).

---

[4] It is unclear from the record precisely when Omega decided to not pay the purchase order. It appears, however, based on Wiener's testimony, that it was after the order was issued:

> The $150,000 purchase order that the IT accountant brought it to my attention as a balance owed requesting payment, I denied it. And that escalated to Mike Ali. And then in turn, Joe Vorih got involved. And we met and discussed it. And because of the amount of work that was required for us to do to just even foundationally get the work done, we all agreed not to pay that.

(Wiener 30(b)(6) Dep. at 144-45). It appears that, later in Wiener's deposition, she was asked when she, Ali, and Vorih had the discussion during which they concluded that they were not going to pay the purchase order. But the page that includes her response is not included in what was submitted by the parties. (*See* Dkt. No. 71-13).

On June 21, 2018, Dino Eliopulos, a Managing Director at Earley, e-mailed Ali concerning the status of outstanding invoices.  (Anthony Dec. Ex. G, at 5).  In response, Ali stated that Omega was disputing the charges because certain work that Omega had contracted with Earley to complete had to be completed by other vendors and because Omega did not receive certain deliverables it believed were to be provided under the Statement of Work.  (*Id.*).  According to Anthony, that response was "the first time that Mr. Ali had told [Anthony] or anyone else at [Earley] that Omega would not be paying [Earley] any further amounts." (Anthony Dec. ¶ 19).  Anthony also states that "around this time, [he] learned that Omega's position was not only that it expected [Earley] to 'just walk away' without being paid the remaining amounts owed to it under the various purchase orders that had been issued by Omega, but that Omega was threatening to sue [Earley] for hundreds of thousands of dollars in damages that [Earley] had supposedly caused, if [Earley] did not 'walk away.'"  (*Id.* ¶ 23).  Anthony, Eliopulos, and Ali set up a meeting for the following week that apparently did not resolve the dispute.  (Anthony Dec. Ex. H).

In summer of 2018, Seth Earley, President of Earley, had lunch with Ali to discuss the disputed invoices.  (Def. SMF ¶ 38; Ali Dep. at 197, 199).  Ali told Earley that he believed that there were problems with Earley's work that justified Omega's withholding payment.  (Ali Dep. at 198; Earley Dep. at 127 ("[Ali] was saying he wasn't going to pay the bill because [Earley] didn't do its job.")).  He informed Earley that Omega "didn't get all the deliverables."  (Ali Dep. at 198-99).  Earley told Ali that he was not aware there were any issues.  (Earley Dep. at 126-27).  At the end of the lunch, according to Ali, he and Earley "agreed to disagree" about whether Earley completed the work and whether the remaining payment was due.  (Ali Dep. at 201).

**B.**    **Procedural Background**

On January 7, 2019, Earley sued Omega in Massachusetts Superior Court.  The complaint

asserted six causes of action:  (1) breach of contract, (2) promissory estoppel, (3) unjust

enrichment, (4) negligent misrepresentation, (5) intentional misrepresentation, and (6) unfair and

deceptive business practices in violation of Mass. Gen. Laws ch. 93A.  After Omega removed

the case to this District, it moved to dismiss the Chapter 93A count for failure to state a claim.

The Court denied that motion.

On August 15, 2019, Earley filed an amended complaint that added a seventh cause of

action:  unfair and deceptive acts and practices in violation of the Connecticut Unfair Trade

Practices Act ("CUTPA").

Omega has moved for summary judgment as to Earley's claims under Chapter 93A

(Count 6) and CUTPA (Count 7).

## II.    **Legal Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence,

viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve

the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8

(1st Cir. 1990) (internal citation omitted).  When evaluating a summary-judgment motion, the

court makes all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*,

994 F.2d 905, 907 (1st Cir. 1993).  "[W]hen a properly supported motion for summary judgment

is made, the adverse party must set forth specific facts showing that there is a genuine issue for

trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and

footnotes omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

III.  <u>**Analysis**</u>

Defendant contends that summary judgment as to the claims under Chapter 93A and CUTPA should be granted.  It reasons that the allegedly unfair conduct amounts to "nothing more than a simple breach of contract," which is not actionable under either statute.  (Def. Mot. at 1).

Chapter 93A prohibits those engaged in trade or commerce from employing "[u]nfair methods of competition and unfair or deceptive acts or practices."  Mass. Gen. Laws ch. 93A, § 2.  To violate Chapter 93A, the conduct in question must constitute an "extreme or egregious" business wrong or "commercial extortion."  *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (citing *Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 169 (2008)).

Run-of-the-mill breaches of contract do not meet that standard.  *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) ("A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A." (citing *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996))).  Neither does "withholding payment based on a genuine dispute about what a contract requires."  *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 38 (1st Cir. 2008) (citing *Duclersaint v. Federal Nat'l Mortgage Ass'n*, 427 Mass. 809, 814 (1998)); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir. 1998) ("Where there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated, it also appears that there is no Chapter 93A liability.").

A party may nonetheless be liable under Chapter 93A if it uses a breach of contract "as a lever to obtain [an] advantage" or if a breach has an "extortionate quality that gives it the rancid

flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992); *Commercial Union Ins. Co.*, 217 F.3d at 40 (explaining that a breach of contract must "rise[] to the level of commercial extortion or a similar degree of culpable conduct" to violate Chapter 93A (internal quotation marks omitted)).  A party may also be liable under Chapter 93A if it attempts to "extract a favorable settlement . . . for less than the amount . . . owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [the other party] to sue." *Arthur D. Little, Inc.*, 147 F.3d at 55-56.

CUTPA imposes liability under similar circumstances.[5]  It prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  Breaches of contract do not satisfy that standard unless they are accompanied by "aggravating unscrupulous conduct." *Naples*, 295 Conn. at 229; *id.* at 228 ("[N]ot every contractual breach rises to the level of a CUTPA violation." (quoting *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. Ct. 557, 571 (2004))); *O'Brien v. Rogovin Moving & Storage Co.*, 2006 WL 3639551, at *4 (D. Conn. Dec. 4, 2006) ("A simple breach of contract does not constitute a violation of CUTPA." (citing *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038-39 (2d Cir. 1995)))).  A breach of contract may support a CUTPA claim only when a party's actions constitute "intentional, reckless, unethical

---

[5] Courts consider the same criteria—first set out by the Federal Trade Commission to determine whether a practice is unfair under the Federal Trade Commission Act—when determining whether conduct violates Chapter 93A or CUTPA:

> (1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
> (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

*PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975); *see also Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 227 (2010) ("It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out . . . by the Federal Trade Commission for determining when a practice is unfair[.]" (quoting *Votto v. American Car Rental, Inc.*, 273 Conn. 478, 484 (2005)) (internal alterations omitted)).

or unscrupulous conduct." *Ulbrich v. Groth*, 310 Conn. 375, 410 (2013); *see also id.* at 410 n.31 ("[M]ere negligence or incompetence in performing a contract will not support a CUTPA claim . . . in the absence of proof of immoral, unethical, oppressive, or unscrupulous conduct." (internal citations, quotation marks, and emphasis omitted)).

Here, plaintiff contends that defendant violated Chapter 93A and CUTPA by (1) inducing plaintiff to perform work through promises of payment that defendant never intended to make and (2) forcing plaintiff to sue defendant to collect payments defendant knew it owed plaintiff. But the factual record offers little support for those allegations.

First, plaintiff contends that defendant falsely promised at the March 2018 close-out meeting to make payment upon completion of the punch-list tasks. As noted, it is not enough to show that defendant breached the contract, or even did so intentionally; instead, plaintiff must show that defendant did not intend to pay at the time it made the promise, and therefore falsely induced it to continue working.

Plaintiff has not met that burden. The record evidence indicates that defendant made the decision to withhold payment *after* that meeting. Ali testified that the April 4, 2018 purchase order—issued two weeks after the close-out meeting—was issued "in anticipation of paying the $150,000," indicating that defendant still expected to pay plaintiff at that time. (Ali Dep. at 177). And Wiener testified that she decided to deny payment after that purchase order was issued. (*See* Wiener 30(b)(6) Dep. at 144). Wiener, Ali, and Vorih then further considered whether to make the payment, and they ultimately agreed to withhold it. (*See id.* at 144-45).

Plaintiff nonetheless contends that the decision to withhold payment was made earlier. It points to the fact that Ali had identified a potential $100,000 savings on the Phase 2 Statement of Work as early as November 2017. (*See* Pl. Opp. at 10 (citing Vorih Dep. at 95-96; Ali Dep. at

129-30)).  But it presents no evidence that connects that potential savings to defendant's ultimate decision to withhold payment.  Ali testified that he believed that the plan to achieve that savings was to "go to Earley and see if there was a way to work with them where they could leverage some offshore resource, either provided by [Omega] or maybe by them."  (Ali. Dep. at 123).  The mere fact that defendant was considering ways to save money on its contract with plaintiff is insufficient to infer that it later made false promises to induce further work from plaintiff.  That inference is made particularly unreasonable considering what defendant learned in the intervening period—namely, that the Phase 2 work was not progressing as expected.  (*See, e.g.*, Wiener 30(b)(6) Dep. at 157 (noting that Wiener "came to the conclusion that Earley had not done some or all of what it was supposed to do under the [Statement of Work]" during the "end of February [or] early March"); Schweizer Dep. Ex. 10, at 1 (January 2018 e-mail from Schweizer to Wiener concerning data-fill progress)).

Plaintiff further contends that defendant's justification for withholding payment is pretextual because defendant had knowledge of the problems with the Phase 2 work at the time it agreed at the close-out meeting to pay the balance owed under the contract:  "Omega's refusal to pay was supposedly based on the problem that it was well aware of in January, February and early March, and which had been explicitly discussed at the March 22 close out meeting itself— namely, that the product-level data required further work."  (Pl. Opp. at 11).  It is true, as noted, that defendant knew, at least to some extent, the problems with the work plaintiff was completing and that those problems were discussed at the close-out meeting.  (*See, e.g.*, Wiener 30(b)(6) Dep. at 157; Schweizer Dep. Ex. 10, at 1; Close-Out Meeting Presentation).  Even so, there is no evidence that defendant knew the full extent of the problems.  But more importantly, even if defendant knew the extent of the problems, that still does not show that it made the

decision to withhold payment prior to the March 2018 meeting, particularly in light of unrefuted evidence to the contrary.  (*See, e.g.*, Wiener 30(b)(6) Dep. at 144-45).

Absent evidence sufficient to establish a genuine dispute concerning defendant's intention to pay plaintiff at the time of the close-out meeting, plaintiff's claims under Chapter 93A and CUTPA cannot survive summary judgment.  *See, e.g.*, *Atlantic Sport Boat Sales, Inc. v. Cigarette Racing Team, Inc.*, 695 F. Supp. 58, 62-63 (D. Mass. 1988) (denying motion for summary judgment because plaintiff "stated sufficient facts to allow a fact-finder to infer that the defendant misrepresented its intentions"); *Southern New England Telephone Co. v. Global Naps, Inc.*, 482 F. Supp. 2d 216, 227 (D. Conn. 2007) (denying motion for summary judgment because there remained a genuine dispute as to whether defendant "intended to avoid its obligations . . . by refusing to pay for the services it ordered").

As to forcing plaintiff to sue, the record offers even less support for plaintiff's position.  Put simply, there is no evidence that defendant "knew" it owed plaintiff under the Phase 2 Statement of Work such that its refusal to pay violates Chapter 93A or CUTPA.  Even though defendant did not make the final contemplated payment, the record indicates that the decision was made based on a genuine dispute about what the Statement of Work required.  For example, in his June 2018 e-mail exchange with Eliopulos and Anthony, Ali stated that he was disputing the final charges because he was "shocked at how much cleanup/fixing/work [defendant] had to do with the product master data and PIM" and because defendant did not receive the anticipated deliverables from plaintiff.  (*See* Anthony Dec. Ex. G, at 3, 5).  Indeed, plaintiff itself notes that "this entire lawsuit is in large part about what was or was not within the scope of the PIM Phase 2 [Statement of Work], which was a time and materials contract with a cap."  (Pl. Resp. to Def. SMF ¶ 20).  "Where there is a good faith dispute over whether payment is actually owed, and

that dispute is clearly articulated, it also appears that there is no Chapter 93A liability." *Arthur D. Little, Inc.*, 147 F.3d at 56; *see also J. Wm. Foley, Inc. v. United Illuminating Co.*, 158 Conn. App. Ct. 27, 60-61 (2015) (affirming dismissal of CUTPA claim because, among other reasons, "the evidence supported the court's determination that [defendant] had the right to dispute each of the issues on which it withheld payment, and that, even on the issues where the court has agreed with [plaintiff,] there was a good faith basis for [defendant's] position" (internal quotation marks and alterations omitted)).  Even plaintiff's allegation that defendant simply expected it to "walk away" (Anthony Dec. ¶ 23) is insufficient to find liability.  *See Jasty*, 528 F.3d at 38 ("Wright's conduct between September 2001 and March 2002 may be viewed as pressuring Jasty to walk away from the contract; however, a party that simply withholds funds but does not engage in any other coercive action is not liable under Chapter 93A." (citing *Boston Pilots v. Motor Vessel Midnight Gambler & E. Coast Excursions, Inc.*, 357 F.3d 129, 135 (1st Cir. 2004))).

In short, defendant may have breached the contract or may otherwise be liable to plaintiff for withholding payment.  But based on the undisputed evidence in the record, its conduct falls well short of violating either Chapter 93A or CUTPA.  Accordingly, the Court will grant defendant's motion for summary judgment as to Count 6 and Count 7.[6]

---

[6] Because the Court has concluded that defendant's conduct constitutes, at most, a breach of contract and is therefore not actionable under Chapter 93A or CUTPA, it need not consider defendant's alternative arguments in support of its motion for partial summary judgment.

13

**IV.**     **Conclusion**

For the foregoing reasons, defendant's motion for partial summary judgment as to Counts 6 and 7 is GRANTED.


**So Ordered.**


                                              /s/ F. Dennis Saylor IV
                                              F. Dennis Saylor IV
Dated:  May 5, 2021                           Chief Judge, United States District Court

14