UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EARLEY INFORMATION SCIENCE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>OMEGA ENGINEERING, INC.<br><br>Defendant. | C.A. No. 1:19-cv-10364-FDS<br><br>**PLAINTIFF'S MOTION AND SUPPORTING MEMORANDUM TO EXCLUDE OPINIONS AND TESTIMONY OF JOSEPH J. SHEPLEY, III, Ph. D.** |

Plaintiff Earley Information Science, Inc. ("EIS"), submits the following Motion and Memorandum in support of its Motion, to exclude the anticipated testimony of Joseph J. Shepley, III, Ph.D., the expert hired by defendant Omega Engineering, Inc. ("Omega").

## FACTS

### A. Background.

EIS provides technical consulting and support for its clients, specializing in organizing and structuring its clients' enterprise information. (First Amended Complaint of Earley Information Science, Inc., ("Compl.") Exh. 1, p. 2.) This case centers around product information management work that EIS performed for Omega as part of a substantially larger Omega project known as "Digital Transformation," also involving many other vendors, to upgrade its online sales capabilities. (Expert Report of Steven R. Kursh, Ph.D., CSDP, CLP, Exh. 6, p. 27). The contract between EIS and Omega (known as the "PIM Phase 2 SOW," attached as Exh. 2) was to provide a variety of services in the area known as "product information management" or "PIM." (Exh. 1, p. 4.) The PIM Phase 2 SOW was a "time and materials" contract with a cap of just over $2 million. (Exh. 2, p. 19.) Pursuant to the PIM

Phase 2 SOW, EIS was to provide the following list of twelve deliverables, described in greater detail in the contract:

3.1 PIM Vendor Selection Recommendation

3.2 Solution Architecture Design Document

3.3 Taxonomy Design

3.4 Semantic Models

3.5 SKU Classification Data

3.6 Data Migration Plan

3.7 Sample Data Extracts

3.8 Migrated Data

3.9 QA Plan and Results

3.11 Project Plan

3.12 Stakeholder Meetings

3.13 Weekly Status Reports and Core Meeting

(Exh. 2, pp. 10-13.) Following the execution of the PIM Phase 2 SOW, EIS began its work, but problems and delays attributable to Omega, and/or vendors chosen by Omega, began almost immediately. These included the following:

- Omega did not make a final PIM vendor selection or make the PIM platform available/ licensed for EIS's use, until almost *five months* after the date required by the SOW. (Exh. 1, p. 5.)

- The PIM platform eventually made available to EIS contained many defects, and required much support and troubleshooting by EIS, which was beyond the scope of the SOW and resulted in substantial delays to the data development and migration efforts. (Exh. 1, p. 5.)

- EIS was unable to complete so-called "beta" testing activities in a timely manner because Quality Assurance ("QA") environments were incorrectly specified by Omega, and delivered late, or not at all. (Exh. 1, pp. 5-6.)

- Omega failed to request and purchase the proper configurations of the QA environments from its third-party vendor, SAP. As a result, the PIM QA environment was only made available to Omega by March 19, 2018 (2 weeks before what was supposed to be the end of the EIS project) and was *never* made available to EIS. (Exh. 1, pp. 5-6.)

- At Omega's request, EIS provided the equivalent of approximately 21 person-weeks of architecture consulting during the delays in Omega making its PIM selection, which work was outside the scope of the PIM Phase 2 SOW. (Exh. 1, p. 6.)

Nevertheless, EIS performed the work required under the contract and as it reached the end of its engagement on the project (March 2018), EIS had been paid approximately $1.8 million out of the $2 million contract price. (Exh. 1, pp. 7-8.) By that time, the Digital Transformation project was beset with very substantial cost overruns, delays, and real or alleged problems with the goods and services provided by many of the vendors. (Exh. 1, p. 5.)

In March 2018, as EIS neared completion of its work, the EIS and Omega had a "close-out" meeting at which they agreed on the remaining work to be done by EIS, and Omega acknowledged that it owed EIS the unpaid portion of the contract price, and would pay for this additional work. (Exh. 1, pp. 7-8.) Following this meeting, Omega issued a purchase order to EIS in the amount of $150,000. (Exh. 1, pp. 7-8.) EIS subsequently performed all of the work agreed to at the close-out meeting. (Exh. 1, p. 8.) Thereafter, Omega simply refused to make further payments to EIS. (Exh. 1, p. 9.) Omega responded to EIS's requests to be paid by telling EIS to "walk away and drop it," and when it became clear that EIS would not do so, by threatening to come after EIS for seven-figure damages that Omega had allegedly incurred as a result of EIS's supposedly "deficient" work. (Exh. 1, p. 9.)

EIS's remaining claims in this lawsuit include: (i) breach of contract (failing to pay EIS approximately $200,000 that it was owed); (ii) promissory estoppel (inducing EIS to perform certain work by making promises of payment); (iii) unjust enrichment (significant problems

attributable to Omega necessitating approximately $350,000 in out-of-scope, unpaid-for work by EIS in order to bring its portion of the project to a useful conclusion); and (iv) negligent and intentional misrepresentation (falsely assuring EIS at the close-out meeting that it would be paid the remainder of the contract price if it performed the work agreed to at that meeting). (Exh. 1, pp. 12-17.) In addition, on any amounts awarded to EIS, it will be entitled to interest under Massachusetts law. Assuming this case goes to trial in mid-2022, that interest will approach $100,000 on the unpaid contractual amount (approx. $200,000) alone.

By way of counterclaim, Omega alleges that it incurred seven-figure damages because (a) it was forced to hire other vendors to do or correct work that EIS was responsible for; (b) it lost revenue and opportunities as a result of delays that are supposedly the fault of EIS; (c) it had to spend time (i.e., resources) internally dealing with these issues; and (d) none of the work that EIS performed had any value, so the entire amount paid to EIS represents damage to Omega. (Omega Engineering, Inc.'s Answer, Affirmative Defenses, and Counterclaims, Exh. 3, pp. 17-20.)

B. **Omega's Expert, Joseph J. Shepley, III, Ph.D.**

In support of its seven-figure counterclaim against EIS, Omega has retained the services of Joseph J. Shepley, III, Ph.D., to testify as an expert on behalf of Omega. In brief summary, Dr. Shepley intends to testify that, in his opinion, four of the twelve deliverables that EIS was to provide pursuant to the PIM Phase 2 SOW did not meet at least 50% of the "specifications" associated with those deliverables, and therefore "likely would not serve the purpose for which [each such deliverable] was intended." (Expert Report of Joseph Shepley, Exh. 4, ¶ 15.) The four deliverables about which Dr. Shepley expresses this opinion are; **3.5** SKU Classification Data; **3.6** Data Migration Plan; **3.8** Migrated Data; and **3.9** QA Plan and Results. (Id.) With respect to the remaining eight deliverables, Dr. Shepley either concluded that they met or exceeded his

"50% test," or he expressed no opinion about them. (See, generally, Exh. 2, pp. 21-62.)

1. Dr. Shepley's Lack of Training and Relevant Experience

Dr. Shepley has no education or other formal training in this field. His Ph.D. is in the History of Christianity. (Deposition of Joseph Shepley, Exh. 7, p. 8.) He has no publications in this field, and no publications of any sort in peer reviewed journals. (Id., pp. 23-24.) Nor does his work experience qualify him as an expert in this case. During his working career, Dr. Shepley has been involved in no more than ten client engagements in which the contractual relationship was "time and materials with a cap," (id., p. 196) and of those ten (or fewer) engagements, ***none*** involved data migration (id., p. 198). His ***only*** experience with data migration was internally (i.e., not for a paying customer) while working at a prior employer, Kaplan Professional (id., p. 199), which provides licensing and continuing education support for real estate professionals. Unsurprisingly, this is the first time he has been retained as an expert on this or any other topic. (Id., pp. 24-25.)

2. Dr. Shepley's Flawed Methodology

In addition, and as an alternative reason for excluding his testimony, the methodology on which Dr. Shepley's opinions are based does not come close to meeting the standards for admissible expert testimony. As discussed in greater detail below, his methodology appears to be an effort to create a scientific (or at least arithmetic) structure for his analysis, by parsing the narrative description of each deliverable into a series of "specifications;" arbitrarily excluding some 25 of those specifications from his analysis, and then determining what percentage of the remaining specifications were (in his opinion) "not met." (Exh. 7, pp. 75-78, 85-86.) For each deliverable where that percentage was 50% or greater, Dr. Shepley opines that the deliverable was "not likely to meet the purpose for which it was intended." (Id.) As noted above, he reached

this conclusion with respect to four deliverables, although in his deposition he withdrew that opinion with respect to one of the four, deliverable **3.9** QA Plan and Results. (Id., pp. 175-178.)

As dicussed in detail below, this "methodology" has no basis in relevant professional literature or peer-reviewed journals. It is entirely of his own creation. It is not based on reliable principles and methods, and and, at least as applied to this case, is arbitrary and unreasonable.

## ARGUMENT

### A. The Court as Gatekeeper and Admissibiity of Expert Testimony

Fed. R. Evid. 104(a) provides that "[t]he Court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." This obligation sees the court in what the Supreme Court calls the "gatekeeping role." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597(1993) (recognizing a concern expressed by amici that the court's power to exclude evidence could stifle scientific inquiry, and finding that nonetheless the "Rules of Evidence [are] designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes"). The admissibility of expert testimony is a question of law governed by Fed. R. Evid. 702, which reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue:
> (b) The testimony is based on sufficient facts or data:
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

### B. DR. SHEPLEY'S TESTIMONY SHOULD BE ENTIRELY EXCLUDED

#### 1. Dr. Shepley's Technical Expertise is Not on Point

"As a routine matter, this Court asks whether the opinion the proffered expert seeks to

give in the case at bar is one that society—outside the litigation process—seeks from this individual as it goes about its daily living." McGovern ex rel. McGovern v. Brigham & Women's Hosp., 584 F. Supp. 2d 418, 424 (D. Mass. 2008) (explaining the preliminary questions a court must ask under Fed. R. Evid. 702). As a formula for fulfilling the Court's gatekeeping obligation per Fed. R. Evid. 702(a) and Daubert, 509 U.S. at 597, this must mean that the Court shall inquire whether the specialized knowledge of the expert in this case, Dr. Shepley, is of a nature to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).

Dr. Shepley's experience is almost entirely unrelated to the central matter on which he is expressing an opinion here: where one party is performing (among other things) data migration services for another party pursuant to a Time and Materials contract with a cap, what constitutes acceptable performance of a data migration-related deliverable? And how do industry norms and practices inform the interpretation of a contract covering such work?

Dr. Shepley's career has not focused on the intersection of project management, product information management, external client interactions and fixed-price contracts with a cap. (See Exh 4, ¶¶ 3-6 and Appendix A, Curriculum Vitae.) As he stated in his deposition, Mr. Shepley has only participated in ten external client engagements covered by a fixed-price contract with a cap, and **none** of those involved data migration. (Exh. 7, pp. 195-199.) His ***only*** experience with data migration was internal to the organization he was working for (i.e., not for a third-party, paying customer) while working at a prior employer. (Id., p. 199.) Dr. Shepley *might* be qualified by his experience to express opinions on taxonomy design. (See Exh. 4, p. 64.) Ironically, though, the taxonomy design that EIS provided to Omega (Deliverable 3.3) is one that, even under his flawed methodology, **meets** his test of an acceptable deliverable (according

to Dr. Shepley, only four out of 13 specifications for the Taxonomy deliverable, or 30%, were "not met). (Exh. 4, pp. 24-31.)

"Federal Rule of Evidence 702 expresses five bases for qualifying an expert: "knowledge, skill, experience, training, or education." Dr. Shepley has not described any educational attainments, specific credentials or peer-reviewed publications that fill the gaps in his experience. His doctorate is in the History of Christianity. (Exh. 7, p. 8.) He has never been published in a peer-reviewed journal. (Exh. 7, pp. 23-24.) He has never appeared as an expert witness. (Exh. 7, pp. 24-25.)

In contrast, the qualifications of EIS's expert, Dr. Steven Kursh, are exemplary and extensive. Rather than recite them here, the Court's attention is respectfully directed to a listing of those credentials, attached as Exhibit 5. Two credentials in particular, however, deserve specific mention in this context. The first is that Dr. Kursh is certified as Certified Software Development Professional by the Institute of Electrical and Electronics Engineers (IEEE) Computer Society. (Id., p. 6.) Earning this certification required documentation of at least 9,000 hours of professional work in software development and passage of a rigorous examination covering the Software Engineering Body of Knowledge, known in the industry as SWEBOK. (Id.) The second is that Dr. Kursh has approximately thirty years of applied and practical experience in the computer, high technology and business fields. During that time, Dr. Kursh has been involved in in well over 200 different software projects, including multiple projects in which the contractual relationship between the parties was "time and materials" ("T & M"), and projects involving software used for PIM. (Expert Report of Steven R. Kursh, Exh. 6, p. 19.)

As noted above, the PIM Phase 2 SOW at issue in this case was a "time and materials" contract with a cap of just over $2 million. In his expert report Dr. Kursh discussed at length the

significance of this as it relates to EIS's obligations vis-à-vis the deliverables. In the executive summary of his report, paragraph 59, he explains:

> 59. First, and most important regarding the allegations from Omega, the work between the parties was on a time and materials (T&M) basis. Typically, within the software industry T&M contracts reflect the fact that the parties are facing uncertainty regarding the development andimplementation process, as well as often that the buyer (*i.e.*, customer, client, licensee) is not completely certain as to its requirements, resources, needs, and other factors. Hence, the Omega allegations including the claimed additional costs and harm are inconsistent with my experience in well over 200 different software projects, including multiple T&M agreements, and projects involving software used for PIM. (Exh. 6, ¶ 59.)

Two paragraph later, Dr. Kursh discusses the significance of this as it relates to the question of how much data and product information EIS was supposed to "migrate" pursuant to the PIM Phase 2 SOW:

> 61. Third, the Omega allegation regarding EIS' obligations to transfer ETL (extract, transform, load) all of the Omega data is inconsistent with my experience in well over 200 different software projects, including projects involving software used for PIM. Customers rarely want to pay for (or even need) all of their data and product information transferred to the new system. Indeed, the conversion process as well as the entire project provides customers the opportunity to "clean their garage" to get rid of product information no longer needed individual products and their SKUs (Stock Keeping Units) rarely if ever require that all possible data attributes are filled prior to being sellable in any particular channel (including eCommerce). (Exh. 6, ¶ 61.)

Dr. Kursh was asked about this topic during his deposition by Omega's counsel on February 12, 2021. The following testimony of Dr. Kursh is excerpted from pages 87-89 of the transcript of that deposition:

> Okay, I'll do my best to respond to them by drawing from, again, the industry overall, and then applying it to this particular matter. The parties in this matter, particularly Omega, had a general sense of what it wanted to do, at a high level, a lot of activity, a lot of different projects, but Omega did not come forward and say specifically in detail [in the PIM Phase 2 SOW] exactly what it wanted.
>
> Now, this is very typical in the industry in software implementation, software development projects, because customers don't really know what they want and it's a moving target and it changes over time, and there are always surprises, particularly, by the way, with data migration, but in other areas as well . . . .

> You can't have exacting standards where it's moving targets: changes, data migration, user specs requirements. In the software development lifecycle we talk about the end of the cycle with maintenance and updates because it's an ongoing always, always, it's never done. Software is never done, it's always a delivery system.

(Exh. 8, pp. 87-89.) This is why Dr. Shepley's lack of real world experience with data migration, particularly in a situation where the work is governed by a T & M contract, is so important to the question of whether he is qualified to testify as an expert in this case. One of the most hotly contested issues in this case is the amount of Omega product data that EIS was supposed to "migrate" into the new taxonomy that EIS created as part of its work under the contract. And three of the four deliverables that Dr. Shepley opines were not performed satisfactorily are directly related to migration of product information and data: **3.5** SKU Classification Data; **3.6** Data Migration Plan; and **3.8** Migrated Data.[1]

In other words, the only three deliverables that Dr. Shepley opines were not performed satisfactorily involve the transfer of product data, which is a topic in which he has almost no real-world experience, and ***no experience whatsoever*** in circumstances where that work is being done pursuant to a T & M contract with a cap on the amount the client has agreed to spend.

2. Dr. Shepley's Method is Not Based on Facts or Data and is Not Reliable

Under Fed. R. Evid. 702(b) and (c) Dr. Shepley's opinion must be both "based on sufficient facts or data" and "the product of reliable principles and methods." It is neither. While Omega, as the proponent of expert evidence is not required to prove at this stage that Shepley's opinion is correct, it is burdened to show that the expert's conclusion has been "arrived at in a scientifically sound and methodologically reliable fashion." Fogarty v. Whole Foods, No. 18-

[1] As to the fourth, **3.9** QA Plan and Results, Dr. Shepley ***agreed*** during his deposition that he had made errors in his report with respect to this deliverable, and it was ***"not appropriate to include deliverable 3.9 in [his] list of deliverables as to which 50 percent or more of the specifications were not met." Exh. 7, p. 178***

CV-11090, 2020 WL 1446728 at *3 (D. Mass. March 25, 2020) (citing Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)) (excluding expert testimony on grounds of unreasonable basis where it depended upon expert's "education, skill, training and engineering experience, and facts particular to the case"); see also U.S. v. Monterio, 407 F. Supp. 2d 351, 366 (D. Mass. 2006) (holding that the "burden of proof with respect to reliability remains on the proponent of the evidence").

Here is the manner in which Dr. Shepley arrived at the conclusion that four of the deliverables were "not likely to meet the purpose for which they were intended":

a. He reviewed the narrative description of each of the twelve deliverables in the PIM Phase 2 SOW, parsed teach narrative description into sentences or sentence fragments, and called those sentences or sentence fragments "specifications" that had to be met as part of each deliverable; (Exh. 7, p. 76.)

b. Of the 91 "specifications" thus generated, he eliminated 25 of them from consideration as "**out of scope**" either because they were "not document based" (i.e., compliance with those specifications could not be determined from a review of documents) or because determining whether those specifications were met was beyond his expertise. (Id., pp. 76-77.)

c. Of the remaining 66 specifications, he separated them into groups specific to each of the twelve deliverables; (Id., p. 85.)

d. Based on a review of documents provided to him by counsel for Omega, he placed each "specification" into the category of "met," "not met," or "unable to determine whether met or not." (Id.)

e. For each deliverable, he determined the percentage of "specifications" that were "not met" when compared to the number of specifications that were "met," "not met," or "unable to determine whether met or not." (Id., pp. 85-86.) For example, if a particular deliverable had four specifications that in Dr. Shepley's opinion were "not met," out of a total of eight specifications that were "met," "not met," or "unable to determine whether met or not," his "not met" percentage would be 50%.

f. For each deliverable as to which the percentage thus derived equaled or exceeded 50%, Dr. Shepley opined that that deliverable "was not likely to meet the purpose for which it was intended." (Id., p. 86.)

g. Using this methodology, Dr. Shepley concluded that out of 12 deliverables to be provided pursuant to the PIM Phase 2 SOW, four had "not met" percentages of 50% or greater. These four deliverables are numerically identified in his report and testimony as 3.5, 3.6, 3.8, and 3.9. (Id.)

There is no scientifically sound or methodologically reliable, or even common-sense basis for this "50%" methodology. There are several reasons the Court should reach this conclusion.

First, he has arbitrarily excluded 25 specifications as "out of scope" because they are not document-based or are beyond his expertise to evaluate. (Id., pp. 76-77.) Dr. Shepley does not offer any explanation of what makes a specification "document based," or why a specification that is not "document based" cannot be assessed, or can be ignored without rendering his analysis meaningless (Exh. 4, ¶¶ 34(e)(i).) More importantly, in any fractional or percentage-based analysis where one is comparing "specifications not met" (i.e. the numerator of a fraction) to total specifications (i.e.the denominator of that fraction), this method means he is arbitrarily eliminating 25 specifications from the "denominator," thereby artificially and arbitrarily increasing the percentage of "specifications not met."

The most obvious example of this is Deliverable 3.8. According to Dr. Shepley, there are two specifications for this deliverable that are not met, out of a total of four, leading him to the arithmetic conclusion that 50% of the specifications are not met, and thus this deliverable is not likely to meet the purpose for which it was intended. But, according to his own "Deliverable Specification Matrix" (Exh. 4, pp. 91-92) there are actually *eight* specifications for Deliverable 3.8, four of which he has classified as "out of scope" and thus removed from the denominator in his percentage analysis. If those specifications were considered in his analysis, the percentage of

"specifications not met" would drop to 2 out of 8, or 25%, and this deliverable could not be included in his group of unsatisfactory deliverables for which 50% or more specifications were not met.

Rule 702 (d) requires that an expert "reliably apply" their method to the facts of the case. This has also been framed as a "relevancy requirement" that "seeks to ensure that there is an adequate fit between the expert's methods and his conclusions" by determining whether the expert's conclusions 'flow rationally from the methodology employed.'" Fogarty v. Whole Foods, No. 18-CV-11090, 2020 WL 1446728 at *2 (D. Mass. March 25, 2020) (citing Samaan v. St. Joseph Hosp., 67- F. 3d 21, 31 (1st Cir. 2012) (description of the gatekeeping obligation). If, like Dr. Shepley, one is adopting a "percentage of specifications not met" approach to analyzing whether deliverables were acceptably performed, it does not "flow rationally" from that methodology to change 2 out of 8 (25%) to 2 out of 4 (50%) by simply eliminating four of the specifications from consideration.

Second, Dr. Shepley gives all of his derived "specifications" equal weight (i.e. he makes no effort to determine their relative importance). (Exh. 7, pp. 77-81). This makes no sense if one is opining that failing to meet 50% or more of the specifications associated with a deliverable necessarily means that the deliverable is unsatisfactory. It is self-evident that some aspects (or what Dr. Shepley refers to as "specifications") of any deliverable are more important than others. This is significant not just with respect to those deliverables that fall into the 50% (or greater) "specifications not met" group, but for all of the deliverables. In Figure 1 of his report (Exh. 4, p. 7) he shows other deliverables for which other percentages of specifications below 50% were allegedly "not met;" even though these deliverables don't fall into the "50% not met" group, this

approach still adds to the impression of unsatisfactory or incomplete performance by EIS. (See, e.g., Exh. 4, p. 63.)

Third, the manner in which he derives some of his "specifications" is not reasonable. For example, there is no basis for his opinion that an "*expected* delivery date" (which is the term used in the PIM Phase 2 SOW) (Exh. 2, p. 10) is the same as a "*required* delivery date" (which is the false equivalence that Dr. Shepley asserts) (Exh. 7, p. 103-104). By conflating "expected" and "required," Dr. Shepley is able to make each "expected delivery date" into a " required delivery date specification" that, he alleges, was not met. This approach also completely ignores the "dependencies" listed in the PIM Phase 2 SOW, Exh. 2, p. 17-18, which is a list of things that **Omega** was supposed to do or deliver by certain dates. Dr. Shepley made no effort to determine, or even consider, whether those dependencies were in fact met by Omega by the dates specified, (Exh. 7, pp. 89, 106, 109-116) which would obviously affect the dates by which EIS could produce some of its deliverables.

Dr. Shepley's report does not state any basis in facts or data for his opinions, aside from enumerating his own professional experiences. Dr. Shepley has recounted certain facts about this case, and has purported to reduce the facts of the case to a form of computable data. (See Exh. 4, ¶¶ 16-33 ("Background"), and ¶ 34 ("Methodology").) The Rules call for more; the expert must explain how his or her experience has allowed them to observe or to learn of objective, external facts or data in the world outside the vacuum of the case. For example, this Court found that a physician board certified in anatomic pathology, hematology and occupational medicine, with ten years of experience, had submitted a report "relatively devoid of substantive content" where the basis for her opinion included little more than a survey of studies on the topic at issue. Milward v. Acuity Specialty Products Group, Inc. 969 F. Supp. 2d 101, 108 (D. Mass. 2013) (on

remand, later aff'd by Milward v. Rust-Oleum Corp., 820 F. 3d 469, (1st Cir. 2016). Likewise the First Circuit found the District Court had not abused its discretion in excluding the testimony of an expert based on a third-party-conducted study of questionable relevance along with "an unpublished, non-peer-reviewed working paper that [the expert] co-authored during the course of [the] litigation." In re Nexium (Esomeprazole) Antitrust Litigation, 842 F. 3d 34, 52, (1st Cir. 2016). These cases illustrate opinions that were found inadequate because the specific bases for the experts' opinion were thin or self-serving. See also McGovern at 423-424 (including "whether [experts] have developed their opinions expressly for the purpose of testifying" among a list of factors for evaluating the reliability of such an opinion).

It appears instead that Dr. Shepley's methodology is entirely novel, and created solely by himself exclusively for the purposes of this litigation. He admitted in his deposition that the 50% threshold he posits for whether enough specifications of a particular deliverable were performed such that a deliverable was "likely to meet the purpose for which it was intended" was not one he had ever seen published, or heard described anywhere, or had discussed with anyone prior to drafting his report. (Exh. 4, ¶ 92; Exh. 7, pp. 87-89.) Although the mechanics of his methodology are described (albeit incompletely) in Paragraph 33 of his Report, Shepley has offered no reason or basis for the methodology, even within his own experience, let alone based on any kind of generally or even marginally accepted method of analysis or system of thought. It is well established that courts need not admit an expert opinion that is connected to the underlying data "only by the ipse dixit of the expert" (setting aside that there is no underlying data in Dr. Shepley's report). General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (finding no abuse of discretion in excluding expert testimony). Such expert testimony can be excluded when "there is simply too great an analytical gap between the data and the opinion proffered." Id.

While it is difficult to argue specifically against the reliability of principles and methods where Dr. Shepley's opinions in fact rest on no principles or externally validated methods, it is clear that his opinions cannot meet any of the factors that a trial judge may consider when applying the standards of reliability set forth in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149–50, 119 (1999). The Kumho court explained that the gatekeeping obligation and test for reliability applies to non-scientific disciplines (e.g. engineering in some cases, or "skill- or experience-based observation"), and found that a trial judge could consider certain factors when determining the reliability of testimony based on such disciplines. Id. at 151. These include: i) whether the expert's proposed technique can and has been tested; ii) whether the technique has been subjected to peer review and publication; iii) whether the rate of error of the method are known and whether there are standards controlling the technique's operation; and iv) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." Kumho at 149-151 (citing Daubert at 592-594).

Dr. Shepley's method fails all the inquiries authorized by Kumho. It is clear that Dr. Shepley's method of analysing the deliverables has not been tested, since it did not exist before the drafting of his report. Likewise, it has not been subjected to peer review and publication, nor has it been generally accepted within any professional community, or any segment thereof. And, since Dr. Shepley's method was designed to analyze only one set of data, the facts in this particular case, there are no standards at all to test or control its operation. These shortcomings of Dr. Shepley's method, and therefore his conclusions, fall "outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'" Kumho at 153, (citing Daubert), (concluding that the District Court was reasonable in finding an expert's testimony unreliable).

## CONCLUSION

For the foregoing reasons, plaintiff Earley Information Science, Inc. submits that its motion should be granted, and that the testimony of Dr. Shepley should be excluded in its entirety.

Respectfully Submitted,
Earley Information Science, Inc.
By its attorneys,

*/s/ Evans Huber*
Evans Huber, Esq. (BBO # 542133)
Jeremiah W. Doyle V, Esq. (BBO # 691637)
Frieze Cramer Rosen & Huber LLP
60 Walnut Street, Wellesley, MA 02481
Tel: 781-943-4000
jwd@128law.com
eh@128law.com

Dated: August 20, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 20, 2021.

*/s/ Evans Huber*